1:12 MJ 3075

## AFFIDAVIT

I, Ryan M. Taylor (hereinafter "Affiant"), Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice (DOJ), being duly sworn and deposed, state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.  This Affidavit is submitted in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a warrant pursuant to a criminal complaint to arrest the persons known as DOUGLAS L WRIGHT, BRANDON L. BAXTER, and ANTHONY HAYNE further described below.

2.  Affiant is a Special Agent with the FBI and has been so employed for approximately three years. Affiant is a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and is therefore empowered by law to conduct investigations, make arrests and execute search warrants for federal felony offenses.

3.  As a Special Agent of the FBI, Affiant is responsible for investigating violations of federal law, including, but not limited to, violations involving terrorism and threat matters. Affiant is trained in various aspects of law enforcement, including the investigation of conduct constituting criminal offenses of international and domestic terrorism including threats and the use of weapons of mass destruction to commit acts of terrorism. Prior to joining the FBI, Affiant served for six years as a Captain in the United States Army as a Military Police Officer. As a military police officer, your Affiant investigated crimes and carried out policing duties. As a result, your Affiant has investigated dozens of allegations of criminal activity, conducted interviews of dozens of suspects and victims, and as a Special Agent, has served as affiant on four search warrant affidavits and one arrest warrant affidavit. Additionally, as a Special Agent, your Affiant has directed undercover operations, including most recently one involving the solicitation of a hitman over the Internet.

4.  The facts set forth below are based upon Affiant's personal knowledge learned through the investigation of the FBI, as well as information obtained from other federal, state, and local law enforcement agencies and information obtained from additional sources. This Affidavit is being submitted for the limited purpose of obtaining arrest warrants for DOUGLAS L. WRIGHT, BRANDON L. BAXTER, and ANTHONY HAYNE.

5.  This Affidavit contains sufficient facts necessary to demonstrate probable cause to believe that the identified subjects have committed, or attempted to commit the stated offenses, but it does not include every pertinent fact, circumstance or statement known to this investigator.

1

6. Based on the facts contained in this Affidavit, there is probable cause to believe that DOUGLAS L. WRIGHT, BRANDON L. BAXTER, and ANTHONY HAYNE have committed the following violations:

a. Title 18, United States Code, Section 371 Conspiracy: If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy;

b. Title 18, United States Code, Section 844(i): Use or Attempted Use of Explosive Materials: Whosoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.

## FACTUAL BACKGROUND

7. The subjects of this Affidavit are the following:

DOUGLAS L. WRIGHT (hereinafter, "WRIGHT") is described as being approximately 6'1", 165 pounds, slight build, with black hair cut into a Mohawk hairstyle, brown eyes and is approximately 26 years old. As detailed below, WRIGHT has been known to use the alias "CYCO."

BRANDON L. BAXTER (hereinafter, "BAXTER") is described as being approximately 6'0", 180 pounds, medium build, with blonde hair, blue eyes and is approximately 20 years old. BAXTER has been known to use the alias "SKABBY."

ANTHONY HAYNE (hereinafter "HAYNE") is described as being approximately 6'0", medium build, brown eyes, blonde hair, and approximately 37 years old. As stated below, HAYNE uses the names "TONY" and "BILLY."

8. The Confidential Human Source (hereinafter "CHS") has been working as a source for the FBI since July 20, 2011. The CHS has a criminal record including one conviction for possession of cocaine in 1990, one conviction for robbery in 1991, and four convictions for passing bad checks between 1991 and 2011. The CHS is currently on probation in Cuyahoga and Lorain Counties for passing bad checks. Since July 20, 2011, the CHS has been paid approximately $5,750 for services and $550 for expenses, the CHS has not been paid since beginning her/his probation. During the reporting period, the CHS has made audio and video recordings and provided information and intelligence that have led to the opening of several additional investigations. Your Affiant has been able to corroborate information provided by the CHS and the information has proven to be reliable.

9. The Undercover Employee ("UCE") has been employed by the FBI for over 15 years and has been working in an undercover capacity for 10 years. The UCE has received

ongoing training in conducting undercover investigations and has participated in dozens of investigations in an undercover capacity.[1]

10. The Brecksville-Northfield High Level Bridge crosses over the Cuyahoga Valley National Park and has support columns within the boundaries of the National Park. The bridge carries State Route 82, a four-lane highway that transects the southern suburbs of Cuyahoga County and northern Summit County. Your Affiant has observed heavy traffic including commercial vehicles and trucks, private vehicles, and government vehicles on the bridge, as well as observing license plates of vehicles issued by states other than Ohio. State Route 82 has interchanges with Interstate Routes 71, 77, 271 and 480.

11. Your Affiant has been in regular contact with the CHS during the length of this investigation and has received information that WRIGHT, BAXTER, C.S., J.S. and HAYNE and others have developed, over time and through several conversations, a plan to blow up or disable the Brecksville-Northfield High Level Bridge crossing over the Cuyahoga River in the Cuyahoga Valley National Park in Sagamore Hills, Ohio. To achieve this end, WRIGHT, BAXTER, and HAYNE conspired together and with others, including C.S. and J.S. for whom arrest warrants are not sought herein, to discuss the logistics of this and several other targets, conducted surveillance and Internet research on locations, performed Internet searches on making explosive materials, and met with an individual who sold them two inert and non-explosive items represented to be C4 explosives contained in two improvised explosive devices (IEDs). Furthermore, WRIGHT, BAXTER, and C.S., agreed to pay that individual $900 dollars and made plans to affix those devices on the structure of the Brecksville-Northfield High Level Bridge on Monday, April 30, 2012 with the intent to detonate the devices later that evening. This plan is detailed in the following narrative.

12. Based on an initial report of potential criminal activity and threats involving anarchists who would be attending an event held by a protest group, the Cleveland FBI directed the CHS to attend that event. On October 21, 2011, at approximately 6:30 pm, and while the CHS was attending the event, the CHS identified four suspicious males with walkie-talkie radios around their necks. Three of the four men had masks or something covering their faces; one male did not. The men were wearing black or dark colored shirts, had black backpacks, carried the anarchist flags and acted differently than the other people in attendance. The four males were subsequently joined by three more males wearing scarves or towels around their heads. The whole group appeared to be together and was constantly moving throughout the crowd expressing displeasure at the crowd's unwillingness to act violently. During a briefing between the protestors and organizers, the organizers explained who would be arrested emphasizing that they wanted everyone to conduct peaceful civil disobedience. One of the original four men turned away and said "f--k that" before the group of men walked away.

13. CHS talked to one of the men in the group of seven and the man introduced himself as DOUG and said that he was from the Bloomington, Indiana area. DOUG was described as a tall white male, in a black jacket, and provided the CHS his telephone number when they exchanged telephone numbers. A search of databases and investigative work identified DOUG LNU (last name unknown) as DOUGLAS WRIGHT. WRIGHT told the

---

[1] A second UCE who is trained in undercover operations and a law enforcement officer was present at one meeting, however the role of that UCE was minimal and the UCE did not participate in a material way.

CHS that he is an anarchist and has been one for twelve years. He showed the CHS where he has had his nose broken and has missing teeth from riots in the past. He also explained that if he goes to jail this time he probably won't get out for a while.

14. On October 25, 2011, WRIGHT called the CHS, but informed the CHS that he was tied up with some stuff and would call the CHS when he got some free time. WRIGHT did provide the CHS his e-mail address. After some e-mailing back and forth between WRIGHT and the CHS, WRIGHT invited the CHS to come meet with him. Through a series of meetings between November 15, 2011 and November 17, 2011 the following information was disclosed to the CHS during unrecorded conversations:

15. WRIGHT explained to the CHS that he and a group of anarchists WRIGHT recruited had been discussing plans involving violence and destruction to physical property in a variety of ways in order to send a message to corporations and the United States government. WRIGHT explained that his group consisted of four other white males, in their early twenties, who previously attended protest events in order to try and recruit new members and to gauge the police response to various protest activities. WRIGHT specifically commented on the Cleveland Police response to an October 21, 2011 demonstration. WRIGHT wanted to see how the police responded and what equipment they used, such as riot gear or just plain street uniforms. Based on the police response, WRIGHT and his group believed that they needed to conduct a diversion in conjunction with any main direct action of violence. The group of five to six men, including WRIGHT, wanted to deploy smoke grenades on the Veterans Memorial Bridge connecting downtown Cleveland to Ohio City, as a diversion while they knocked the bank signs off the tops of the larger buildings in downtown Cleveland. At the time WRIGHT was still in the planning phase and was unsure how they would go about bringing down the signs. WRIGHT stated that the signs are the most important part because they need to make sure everyone knows that the action was against corporate America and the financial system, and not just some random acts.

16. WRIGHT further explained the he and his group believed that those in leadership at the demonstrations were working with corporate America and law enforcement and that they needed to recruit new people outside that organization for their operation. WRIGHT was planning on recruiting in homeless shelters and neighborhoods on the east side of Cleveland.

17. WRIGHT told the CHS that he had also scouted the tunnels under the city of Cleveland as possible locations to attack, but later reconsidered because he thought the police had too many cameras and security personnel monitoring the tunnels.

18. From November 15, 2011, until approximately February 15, 2012, the CHS had occasional contact with WRIGHT due to the weather preventing most outdoor protest activities. These conversations were not recorded, in part, because WRIGHT did not discuss more definite or detailed plans for criminal activity.

19. On February 15, 2012 the CHS reported that the CHS called WRIGHT and confirmed they were going to meet for breakfast. WRIGHT asked the CHS to pick him up at a drugstore in Cleveland. The CHS picked WRIGHT up at Walgreens and they drove to a restaurant in Cleveland for breakfast. The CHS inquired about WRIGHT's plan to bring down bank signs in downtown Cleveland. During the conversation the CHS implied that the plan was created by others in the group at which time WRIGHT corrected the CHS and stated he

still wanted to do it and emphasized that it was his plan to bring down the signs and not the other members of the group. WRIGHT told the CHS that he was worried about the other four members of the group and had limited contact with them over the last couple weeks. When asked why he was worried, WRIGHT stated that some of the members of the group were unsure about the CHS and WRIGHT was annoyed because he had already vouched for the CHS. Despite his annoyance, WRIGHT still planned on meeting with the group more regularly to start planning for the spring time.

20. WRIGHT further stated that there were not enough anarchists in Cleveland to do what he wanted to do and that more people would be needed in order to help confuse and deter law enforcement. WRIGHT talked about how in other cities anarchists form a crowd and the outer ring of the crowd will cause damage and riot. When the police show up, the outer ring merges into the center of the group and the center moves to the outside. This technique is called a "Black Block" and is designed to make it difficult for law enforcement to figure out who to arrest. WRIGHT said not enough people are in Cleveland to conduct this type of riot.

21. During this breakfast meeting WRIGHT said it will start getting warm soon so people are going to want to start doing direct actions, referencing anarchist activity. WRIGHT stated that now is the time to start planning because the Democratic and Republican conventions are approaching and many politicians will be traveling through Ohio over the spring and summer months. WRIGHT again expressed concern over the number of people in the group and that they would have to do more subtle things because not enough people are around to protect one another.

22. WRIGHT told the CHS he is going to show the CHS how to make smoke bombs and would contact the CHS later in the week to set up a time to make the smoke bombs. WRIGHT was going to look up some recipes in the Anarchist Cookbook and told the CHS they can make a couple recipes to see what works best.

23. During the meeting on February 15, 2012, WRIGHT explained that two other members of the anarchist group in Cleveland are BRANDON LNU, later identified as BAXTER, and Ryan LNU. BAXTER lives in Lakewood, Ohio and WRIGHT believed that BRANDON is important in planning and executing some actions because he has been active in the past and knows the area much better than WRIGHT. WRIGHT believed BAXTER traveled to Philadelphia for an anarchist protest.

24. WRIGHT also explained that he wanted to buy a retractable baton and talked about either buying one at a gun show or at an Army/Navy surplus store. WRIGHT did not want a gun because he has a prior felony conviction and did not want to risk the police arresting him for an illegal firearm possession.

25. On February 20, 2012, the CHS met with WRIGHT and BAXTER. The CHS picked WRIGHT up from a drugstore in Cleveland. WRIGHT and the CHS then drove to BAXTER's home to pick up BAXTER. The two men and the CHS then went to a restaurant located in Lakewood, Ohio. During the lunch, the group talked about plans to target various places in Cleveland. The locations they talked about taking action against included a hospital or bank using stink bombs, explosives and/or paint guns. WRIGHT brought up possibly purchasing C4 explosives but said it may not be an option because of the cost associated with

finding and buying C4. WRIGHT and BAXTER decided that doing some kind of attack during the opening of the new Casino in Cleveland would make a good statement. BAXTER went on to talk about the G-8 in Chicago and the Republican convention in Tampa.

26. On February 24, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS, WRIGHT, BAXTER and C.S. In sum and substance, the CHS was introduced to C.S. and TONY LNU, later identified as HAYNE, for the first time and WRIGHT explained to the CHS that C.S. and HAYNE are legitimate members of the group and that WRIGHT would like them to get involved with the group's plans.

27. During this meeting WRIGHT and BAXTER talked about getting the Anarchist Cookbook but that they have not downloaded it because they do not want to be tracked on-line. The group then talked about a computer program you can buy for fifteen dollars a month that keeps people from tracking you on the Internet. They discussed using pre-paid debit cards or anonymous online accounts that use alternate currencies as a proxy for real dollars like "bitcoin" accounts to buy the program without leaving a traceable financial trail. BAXTER explained that he has a friend who is a hacker and can transfer paper money to bitcoins. He stated that you need some proxy to do it and both BAXTER and WRIGHT tried to explain how the bitcoin system works.

28. On March 2, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS, WRIGHT, BAXTER and C.S. In sum and substance, WRIGHT asked the CHS if s/he had his/her computer in the vehicle. WRIGHT stated that if the CHS had his/her laptop he would be able to show the CHS a website where the CHS can buy online debit cards. At the urging of WRIGHT, the three subjects and the CHS agreed to start using an anonymous email and proxy server system like Hushmail accounts as a means of communication so that they cannot be tracked on-line.

29. On March 22, 2012, the CHS was provided a body recorder consensually recorded a meeting between the CHS and WRIGHT. In sum and substance, WRIGHT described using an upcoming festival as an opportunity to create a civil distraction in order to commit a larger act of violence. WRIGHT also discussed making smoke bombs and other explosive destructive devices using the Anarchist Cookbook, a book that describes the construction and use of weapons and explosives. The following are some of the relevant excerpts from that conversation:

WRIGHT: We can make smoke bombs, we can make plastic explosives, we can make, like, we can-it teaches you how to pick locks. It does everything. (laughs)

CHS: How much do we nee-what-- how much money we need to make explosiv-make the plastic explosives.

WRIGHT: I'm not sure, I haven't really read too much into yet, um, I'll have to get into that. I just downloaded it last night.

CHS: Well you gotta get with me—

WRIGHT: Should be able to find it.

CHS: You gotta get with me, uh, if we gonna be trying to do something in a month you need to get with me as soon as possible on how much money we gonna need—

WRIGHT: Definitely.

CHS:--and the materials that we gonna need. Tell me what all we need to make the bombs so that we can, uh, start gathering—

WRIGHT: Mainly bleach.

CHS: Bleach?

WRIGHT: You can make plastic explosives with bleach. That's actually what they used to use during like World War II, World War I for like land mines and hand grenades and stuff. They use bleach.

CHS: Well what makes it blow up?

WRIGHT: I'm not even sure but that's, that's what you make it out of is bleach. They teach you how to make all this stuff out of simple household items so that way you don't go get all this stuff and then people are looking at you like "what are you doing?".

30. On March 23, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS and WRIGHT. In sum and substance, WRIGHT was asked if he determined a target for the group to attack. WRIGHT responded, "not yet" because he had not "had the chance to get with BRANDON" (referencing BAXTER).

31. WRIGHT stated he did not bring the Anarchist Cookbook but that he did have it and would print off pages for the CHS. The CHS asked WRIGHT about whether he wanted to make the explosives themselves or just buy them from a person the CHS knew who could supply such explosives. WRIGHT replied, "Ah, let's just. We need to just get together with Brandon. At some point. All three of us where we can have a chance to sit down and all three of us talk, not here and there kind of thing. And not, because he has got a lot of good ideas too."

32. On March 28, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS, WRIGHT and BAXTER. In sum and substance, WRIGHT and BAXTER discussed bringing a bunch of anarchists to Cleveland for an event they plan on holding during the last week in April.

33. During this meeting BAXTER and WRIGHT discussed what it would take to blow up a bridge as they drove over a bridge in Valley View, Ohio. BAXTER specifically stated, "How much do we need to take out a bridge?" The conversation then turned to blowing up a bridge in the corporate district of downtown Cleveland and that by blowing up a bridge it would cause a lot of financial damage. They continued to discuss how taking out a bridge would lead to the government having to put security on every bridge in the country. The

"Detroit" bridge[2] was identified as a potential target by WRIGHT because it connects downtown Cleveland and Ohio City. The men talked about the defunct subway system on the bridge and possibly using the subway as a way of accessing parts of the bridge. BAXTER and WRIGHT stated they don't want people to think they are terrorists, so they would want to blow up the bridge at night or possibly pretend to be a construction crew and drop orange cones off at each end of the bridge to stop traffic before blowing up the bridge, thus limiting the number of casualties and the potential for killing possible supporters. Below is a transcript of the relevant portions of the conversation:

BAXTER: How much do you think we need to take out a bridge?

CHS: It depends on (ui) it depends on how (ui) i mean if you're talkin' a bridge like the size of this...(ui) right here...i mean you would need quite bit.

WRIGHT: (ui) Smaller bridge (ui)-

CHS: Right, that's-

WRIGHT: Smaller bridges would (ui). this would be a good one (ui)-

BAXTER: It would be!

CHS: To...to take this...this is the Valley View Bridge that we on. Now, if you go down...I could show you...I could...we could get off right here (ui) and I could show you where the base is and that. You can get off at this exit right here and (ui) around the corner from where we're going. If you get off at this exit right here on Ninety-Eight, I could take you down into Valley View and you can see how the base of it is. (ui) now that run, it lands us (ui) bridge (ui) and...um-

BAXTER: Taking out a bridge in the business district would cost the...um...would cost the corporate big wigs a lot of money not just because of structural damage to the bridge but because it's going to stop a lot of people going to work

CHS: Going to work. Gotta slow the traffic that's going to make them money. And it's the main bridge comin' across from the west side...it's the main bridge comin' from the west side to the east side. I would say...because you don't need to drop the whole bridge frame-

BAXTER: Yeah...just part of it.

CHS: Right. So I wouldn't say cut (ui) out. I would say if we can...I would say it wouldn't probably take that much-

WRIGHT: It's simple.

CHS: What are you talkin' about (ui) like C4 blocks?

---

[2] Based on your Affiant's review of the recordings and knowledge of Cleveland, the "Detroit Bridge" is the Detroit-Superior Bridge, also known as the Veterans Memorial Bridge.

WRIGHT: (UI)

BAXTER: Oh so you guys were talkin' about-

WRIGHT:    (UI)

CHS: No, I was sayin' (UI)-

WRIGHT: It wouldn't take much (ui) simple.

CHS: Probably two?

WRIGHT: Yeah. Probably like two or three (ui) it depends (ui) like if we want the
       whole thing or just enough so cars can get by. I mean it ain't gotta be that
       big.

34. At the end of this conversation, WRIGHT and BAXTER requested the CHS reach
out to his contact in order to discuss purchasing various types of riot gear, canisters of tear
gas, gas masks, and batons. WRIGHT also wanted to compare C4 in cost and quality with
what he could make using the Anarchist Cookbook.

35. On March 28, 2012, two FBI UCEs met with the CHS, BAXTER and WRIGHT as
requested by WRIGHT and BAXTER. The meeting was recorded by one of the UCEs and the
following information was provided in sum and substance. The UCE, upon arriving at the
meeting location, placed riot and protesting type gear on the floor in the kitchen area of the
vacant residence for WRIGHT, BAXTER and the CHS to examine. The riot and protesting
type gear included ballistic vests, ballistic helmets, batons, gas masks, tear gas canisters,
smoke grenades, gloves, and photographs of explosive materials. After looking at and
discussing the aforementioned items, WRIGHT and BAXTER agreed to purchase five
ballistic vests, five retractable batons, and ten canisters of tear gas for $1,150 plus the price of
five additional gas masks. The UCE asked WRIGHT and BAXTER if they needed the "heavy
stuff" while pointing at the photographs of the explosive materials. WRIGHT responded that
"yea we are going to wait on that umm we definitely might be interested later but not right this
minute." WRIGHT and BAXTER informed the UCE that they needed the items in three
weeks. WRIGHT told the UCE they would pay cash on pickup.

36. On March 31, 2012, the CHS was provided a body recorder and consensually
recorded a meeting between the CHS, WRIGHT and BAXTER. In sum and substance, the
group talked about how buying the C4 would be illegal but that buying it would be safer than
trying to make it. BAXTER stated he has a friend who owns some storage units and they
could store the explosives in his friend's unit. WRIGHT asked the CHS how much s/he was
going to cover, related to paying for the riot gear and explosives, because that would
determine how much they would have to cover.

37. BAXTER then discussed the fact that he believes the city of Cleveland is going to
give him a difficult time about acquiring a permit for an upcoming festival. He wants to
march on city hall. BAXTER said, "I'm going to straight up tell the city we are not playing by

your f--king rules." He continued by saying he knew the city was trying to shut them down and that, "if you shut it down we will blow it wide open." BAXTER was also upset because he is presenting the festival as a family friendly event and the city is still not supporting them. When asked about comments BAXTER previously had made about how the last few days of the festival were going to get crazy, BAXTER replied "Yea, but they don't know that."

38. BAXTER explained that he cannot get the money needed for the protest/riot gear and explosives from other sources. WRIGHT continued the conversation by saying he could make the money selling "weed" but that he would need some start up money. WRIGHT said he has a guy to buy high quality marijuana from and knows enough people to whom he could sell the drugs.

39. Before leaving the vehicle, WRIGHT asked the CHS if s/he had purchased a computer yet. The CHS explained that s/he had bought one and would get it to WRIGHT the next day. WRIGHT offered to place software on the computer to make it "stealthy" and so they can keep all their plans on the computer. WRIGHT stated he would also install a desktop icon that will reformat the hard drive in case of an emergency.

40. On April 1, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS and WRIGHT. In sum and substance, while driving to a meeting with the UCE to finalize the order and discuss payment options and amounts, the CHS asked whether C.S. was in or out of the group. WRIGHT said he trusted C.S. but that C.S. gets "sketched" out easily. WRIGHT also stated that they were going to buy two blocks of C4 because they are really powerful and you don't need much.

41. On April 1, 2012, an FBI UCE met with the CHS and WRIGHT. Due to a failure to properly activate the recording device, the meeting was not recorded. The following information is provided in sum and substance from that meeting. WRIGHT asked the UCE if there was any work he could do for the UCE to pay for the items he was going to purchase from the UCE. WRIGHT informed the UCE that he and BAXTER, the person the UCE met during the meeting on March 28, 2012, wanted to purchase two bricks of C4 explosives in addition to the ballistic vests, tear gas cans, and Israeli gas masks they ordered last time. WRIGHT also informed the UCE that they did not want to purchase the metal batons because they could get them cheaper than the UCE's price.

42. The UCE informed WRIGHT that he could obtain the two bricks of C4 explosives but had a total of eight bricks for sale. The UCE informed WRIGHT that he would sell the two bricks of C4 explosives for $75 dollars apiece. The UCE asked WRIGHT if two bricks of C4 explosives were enough to accomplish what they needed. The CHS hypothetically asked the UCE if the two bricks of C4 explosives were powerful enough to take down a column. The UCE told WRIGHT and the CHS that it would depend of the size of the column. WRIGHT and CHS stated that the column would be supporting a bridge. The UCE told WRIGHT and the CHS that he didn't know if two bricks of C4 explosives would take down a bridge column because the UCE was not a demolition expert. WRIGHT and the CHS negotiated the price of the C4 and the other items and the UCE agreed to sell all eight bricks of C4 explosives for $50 dollars apiece. The UCE told WRIGHT and CHS that he would only sell the C4 explosives for $50.00 dollars apiece if they purchased all eight bricks.

43. WRIGHT asked the UCE if he could sell the eight bricks of C4 explosives, ballistic vests, cans of tear gas and Israeli gas masks for $800 dollars. The UCE told WRIGHT that he could sell all those items for $900 dollars. WRIGHT and the UCE agreed to the $900 dollar price. WRIGHT and the UCE also agreed that WRIGHT would pay the UCE $450 on delivery and the remainder within the month after delivery or WRIGHT could work off the remainder of the amount owed.

44. WRIGHT informed the UCE that he had carpentry skills and also could transport items for the UCE. WRIGHT informed the UCE that he could borrow money and sell several types of drugs, to include marijuana, pills and cocaine, to pay the UCE for the aforementioned items. The UCE informed WRIGHT that whatever he did to pay for the items was up to him and does not involve the UCE.

45. After leaving the meeting with the UCE, the CHS recorded her/his conversation with WRIGHT. The CHS said to WRIGHT, "That worked out good." WRIGHT replied, "yea, real good." WRIGHT went on to say, "that's 450 and 450" in reference to the payment for the explosives and protest/riot gear and that he was good with the agreement. WRIGHT was going to start to get the bridge schematics and he confirmed that BAXTER wants to target the bridge in the business district. WRIGHT also explained that he has not looked at the bridge yet and has never used explosives before but that, "all we got to do is get away and push the button."

46. On April 7, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS, WRIGHT, BAXTER, and C.S.

47. In sum and substance, the CHS told C.S. that the other day was the first day that he got to be around him [CHS], when they were working together. CHS asked WRIGHT if he talked with C.S. about everything. WRIGHT advised he had. The CHS advised that he [CHS], WRIGHT and BAXTER have already come to an agreement [concerning the use of explosives to blow up a bridge], and he wanted to make sure he was good, because if he [C.S.] was not in the agreement, he did not want him around. C.S. advised he was in agreement with the plan.

48. The CHS asked which bridge they wanted to hit and advised they are not that far out from the operation, time wise. BAXTER advised he was just throwing around ideas and does not know exactly what they should do. BAXTER advised he was really thinking that taking out a bridge was a good plan, but he did not know how the general public would take it, and he did not think the media would portray that in a good way.

49. The CHS asked what they were going to do with the C4 because they are on the hook for it. In response to the CHS' question, BAXTER said, "Yeah." WRIGHT stated "we have eight pounds of f--king C4."

50. BAXTER advised that in Oakland, they went to a Klan rally, and hit them with rocks to stop the rally. BAXTER suggested looking to find out if there is a neo-Nazi or Klan headquarters in Ohio and see if they could blow that up. The CHS advised there is a Nazi/Klan headquarters here, but advised it was in Southern Ohio, in Lodi, or Wooster. CHS asked what they thought about that. WRIGHT opined it depended on where it is located. CHS

11

advised that Lodi is about 45 minutes to an hour away. WRIGHT advised they needed to find exactly where this place was before they started. WRIGHT asked the CHS if s/he knew.

51. BAXTER advised it would not stop money flowing to the "One Percent", and that blowing up a bridge would just piss off the people who take the bridge every day. BAXTER suggested derailing a train off of a railroad bridge, and advised there are not too many passenger trains anymore. WRIGHT advised the trains would just re-route and still get it from point A to point B, and all that would do is interfere with people who ride trains.

52. CHS advised BAXTER s/he was concerned, and explained that s/he is new to this kind of activity and does not know enough to make decisions on it. CHS advised s/he is following their lead but does not want to do anything without complete agreement. CHS alluded to the group that if they do not know what they really want to do, the CHS is out. But, the CHS advised if they do know, then s/he is in, and s/he has already proved that because everything they asked the CHS to do, s/he has done. CHS asked C.S. what he thought. C.S. asked how much C4 they had. The CHS advised they have eight blocks. C.S. suggested targeting mines and/or oil wells. C.S. stated the oil wells are small scale, and they could take out several at one time.

53. CHS asked C.S. if he knew the technical side of working with C4; C.S. advised he did not know about C4. CHS advised the supplier of the C4 would give them the C4 fully operational.

54. WRIGHT suggested getting a car that they can drive into the Federal Reserve Bank with C4, and blow it up. Upon hearing WRIGHT mention blowing up the Federal Reserve Bank, BAXTER advised this in now higher scale, and wanted everyone to agree this was an open discussion. BAXTER advised people have been attacking banks and the Federal Reserve for a long time, and the Federal Reserve has branches all over the country. The group discussed where the Federal Reserve Banks were located.

55. The group then discussed attacking the Fusion Center[3]. BAXTER advised there is one Fusion Center that is located in a secret location. BAXTER advised the Fusion Centers maintain a watch list on everyone who made a post on Facebook that questioned government authority. The group agreed that to take out a Fusion Center database would be extremely difficult. Someone in the group advised there was a Fusion Center in Cleveland, Ohio, that was located in the Justice Center. The group joked about taking out the Justice Center, but agreed it would kill too many inmates.

56. WRIGHT joked that he would wear a suicide vest and walk in and blow himself up, but advised he would have to be very drunk. BAXTER advised at one time he wanted to do a suicide attack, but agreed it would be better to live through the attack and fight another day.

57. The group again discussed the Fusion Center, and agreed it would be best to find someone who worked at the Fusion Center who had access, and to have that person plant the device for them inside.

---

[3] Fusion Centers are offices where federal, state, and local jurisdictions share law enforcement resources and intelligence.

58. CHS asked the group if they were switching from the bridge to the Fusion Center. WRIGHT told C.S. to get a secure Hushmail account, and that the government could only read his Hushmail if he was suspected of committing a crime in Canada. WRIGHT suggested they meet every couple of days to discuss their progress.

59. CHS asked what car s/he should drive on the day of the operation. WRIGHT suggested they drive a car owned by the CHS, a Dodge Charger, since it was faster.

60. On April 10, 2012, the CHS was provided a body recorder and consensually recorded a meeting between the CHS, WRIGHT, BAXTER, and C.S. In sum and substance, BAXTER explained that he does not know what to do with the explosives and that he has never considered blowing anything up before. BAXTER said that when it comes to black blocking, or counter-riot control, that there will be others there doing a black block and there is a good possibility there will be at least one other person who will have counter-riot gear as well.

61. The CHS asked the others what it is they wanted to do. C.S. stated that he has never spent much time thinking about it, but if he had explosives he would target resource extraction points. He believes the Justice Center would be a good target, but would be difficult and they would risk hurting inmates. WRIGHT stated that the Justice Center has too much security and it is out as a target. WRIGHT suggested that they could find out more information about the Fusion Center in Columbus, which could be a possible target.

62. BAXTER said that they had never decided on the bridge, they were just throwing out options and they had never decided on anything. WRIGHT said that bringing down the bridge would slow down corporate traffic in the river. WRIGHT asked if the C4 explosives could be submerged in water and blow a hole in a cargo ship to "f--k up" some merchandise. He also suggested going outside of Cleveland so there would be no surveillance.

63. The group discussed that the explosives would have remote detonators and that a detonation line would not need to be run between the IEDs and the detonators. WRIGHT said that they would have some homework to do on whether they wanted to take out a certain cargo ship or not. He suggested doing it during the "fest" or May 1st, because police will be downtown and not around the bridge. In order to create an alibi, WRIGHT suggested they could be downtown and be seen, then get to the river to blow up something, and then go back downtown; however, they would have to do some research to find out what types of ships come up the river. The group agreed that they will have to make it a mission to work on the plan. BAXTER stated that if they can come up with a feasible plan then he does not care what they do. He said that they would need to put the IEDs in something waterproof and have it right below the surface if they wanted to blow up a ship.

64. BAXTER and WRIGHT stated that they are in but C.S. believed it would be hard to pull off because it would be difficult to make C4 a depth charge. WRIGHT reiterated that ships are a "d--n good target" and all the cops would be downtown for May Day. C.S. remained concerned it would be hard to make it work. WRIGHT then explained that they could weigh the explosives down like an anchor to keep it in place under water, just like boats use anchors to stay in one spot. BAXTER said that this is plan "A" but they should leave a spot for plan "B."

13

65. In support of the ship plan, BAXTER further stated that the C4 would definitely detonate underwater. WRIGHT believes that if they put the two devices together that eight pounds of C4 would blow a hole in the side of a ship. The group then watched a video on the CHS' computer of C4 exploding underwater. Based on the questions raised by C.S., the CHS asked if they were scratching the plan or they were doing something else.

66. The CHS said that he wanted to keep the C4 in one of his properties so that they do not have to involve anyone else in the plan. Furthermore, the group discussed that they should meet every two, three or four days and should meet next on eitherThursday, Friday or Saturday. They then decided to have the next meeting on Thursday and then again on Monday because Monday, April 23, 2012, would be the last meeting before meeting the UCE. They discussed that the gas masks and batons were included in the order.

67. BAXTER stated that he is rallying May Day so he could act as a decoy or diversion and move the crowd away from the river so that the police are moved away as well. He agreed that he could move them to another place such as city hall after WRIGHT's suggestion. WRIGHT told BAXTER to figure that part out and bring it to the next meeting and that he would figure out the information about the river.

68. As the conversation continued, BAXTER asked if they would be able to throw the explosives in the river after the CHS asked who would be getting in the river. WRIGHT said they should toss it all because they do not want to throw too little and they do not want to have any left over. BAXTER said "the more the merrier." They agreed that they still need to figure out a time to do it. BAXTER stated that they may not have to drive downtown that day because there is talk about setting up a tent city. However, everyone agreed that they would need a driver, the CHS, to get away after. The CHS reviewed that they were going to do it on May 1, s/he would be the driver, using her/his Charger, and BAXTER was going to be the decoy.

69. BAXTER stated that some anarchists may leave before May 1st because their own cities are having May Day events. BAXTER thinks he may not be able to control the crowd depending on the size. He believes that the crowd will most likely be people provoking the police and there could be rioting or looting; he affirmed he is not opposed to rioting and looting as long as it is against the corporations. BAXTER stated that "May 1st is going to be crazy." He also suggested they get masks to wear while there is no gas going off.

70. WRIGHT then stated that it would be a joint effort between WRIGHT and C.S. to detonate the explosives. They will tie the two bundles of explosives together. He suggested using Google Maps to figure out the area where the bombs will be dropped and the get-away route; BAXTER suggested driving by slowly with a video camera so they could watch it instead of getting out to check out the area.

71. Finally, the group discussed what would happen if they were caught. BAXTER thought that they will all go to Guantanamo Bay if they get caught, they will not go to a normal prison. To prevent capture, he suggested getting tacks that they could throw out of the back of the car if they get in a chase. The CHS suggested getting a spray that makes a glare on the license plate so cameras cannot pick up the plate. BAXTER suggested getting false plates. The CHS said that s/he can get plates from somewhere and they can change them back once they are out of the area. BAXTER said they should bring a change of clothes, nails, and a bag

**14**

to put their old clothes in so they could burn them. They agreed that they will need to get weights to aid in the disposal of their clothes. The group agreed that they should not bring their cell phones, they should get walkie talkies. Lastly, WRIGHT said that they should download software to hide their IP address; they can probably download a program free through Torents, a file-sharing website. The group also confirmed that they are going to pay $450 the following week and then the second half the following month.

72. On April 12, 2012, the CHS was provided with a body recorder and consensually recorded a meeting between the CHS, WRIGHT, BAXTER, and C.S. In sum and substance, the following conversation was recorded:

73. WRIGHT, BAXTER, and C.S. agreed that they were in the process of moving into the residence in Cleveland, Ohio. The group then reviewed the plan discussed during the last meeting and agreed that the plan would be for WRIGHT and C.S. to detonate explosives on May 1st that were placed in the Cuyahoga River in order to sink a cargo ship. BAXTER would be leading a march away from the river at the time of detonation in order to create a distraction for the police. The CHS would operate as the "get away" driver once the explosions happened. The CHS then asked each individual if they were in agreement with this plan several times and each member agreed they wanted to continue with the plan just discussed.

74. On April 18, 2012, the CHS was provided with a body recorder and consensually recorded a meeting between the CHS and WRIGHT.

75. In sum and substance, the CHS asked WRIGHT if everyone in the group was still good with the plan and WRIGHT said yes. WRIGHT explained that C.S. is definitely in agreement with the plan and that BAXTER has not been around that much because he recently got a job. WRIGHT told the CHS that the other members of the group were nervous that the UCE was in fact a police officer; the CHS told WRIGHT that s/he would pick up the explosives for the group if they think the UCE selling them the explosives and other items was in fact a cop. WRIGHT stated he hasn't dealt with the guy before so that is why he is a little worried, but he is still planning on going with the CHS to pick up the explosives. The CHS told WRIGHT that he should call the UCE and push the delivery date back because they were still planning the direct action. WRIGHT agreed and called the UCE while in the car with the CHS and changed the delivery date to Saturday, April 28, 2012.

76. WRIGHT stated that they still needed to do their recon and explained that they have to make sure they do not get caught. WRIGHT told the CHS he has looked up a park on Google maps and thinks it would be a good spot for the direct action.

77. On April 19, 2012, the CHS was provided with a body recorder and consensually recorded a meeting between the CHS, WRIGHT and C.S.

78. In sum and substance, the CHS told C.S. that s/he will meet the guy selling them the explosives if that makes him feel better about the situation since C.S. thinks the guy could be a police officer. The CHS asked C.S. and WRIGHT if they were still good to go with the plan and both said yes. The plan, however, had changed slightly from the last discussion. Rather than throw explosives off a bridge to blow up a ship, WRIGHT stated he favored placing the explosives on a bridge in an attempt to destroy or disable the bridge itself. To

further this plan, WRIGHT and C.S. discussed the changes to the plan and identified a bridge that would be targeted.

79. The bridge identified by WRIGHT was the Brecksville-Northfield High Level Bridge crossing over the Cuyahoga River and the Cuyahoga Valley National Park in Sagamore Hills, Ohio.

80. WRIGHT, C.S. and the CHS then talked about doing a recon of the Brecksville-Northfield High Level Bridge on Friday, April 20, 2012. WRIGHT, incorrectly identifying the national park as a state park, advised that they could just walk around the bridge. WRIGHT said that they just need to bring down the Brecksville-Northfield High Level Bridge and that as long as stuff "gets f--ked up" he'll be happy with the action.

81. On April 20, 2012, the CHS drove WRIGHT and C.S. to the Cuyahoga Valley National Park directly below the Brecksville-Northfield High Level Bridge to do surveillance and planning. The CHS was provided with a body recorder and consensually recorded a meeting between the CHS, WRIGHT and C.S.

82. Upon arriving at the location, WRIGHT observed that the Brecksville-Northfield High Level Bridge is a two lane bridge and opined that eight blocks of C-4 will take out a good chunk of it or it will at least drop out a whole section of the bridge. The CHS said they should walk down along the side of the train tracks running underneath the bridge[4]; however WRIGHT wanted to go in the middle, away from the railroad tracks and people. He also stated that if the bridge loses one of the arches the whole thing will probably come down.

83. WRIGHT explained that the bridge is an old bridge and is not built like present day bridges; new bridges are built in pieces and this one is all connected. He stated that if one part is taken out then the whole thing is going down. WRIGHT pointed out the center of the bridge and stated that they would have to hit either one of two columns. WRIGHT stated that the issue with the bridge was that there is nowhere to hide the explosives. He speculated that they could place the explosives on the first shelf of the bridge. The CHS asked who was going to get up there, but no one wanted to go up and place the explosives on the shelf. WRIGHT said that they are all in the open and there is nowhere to hide the explosives unless they bury them. CHS suggested placing the explosives toward the back of the bridge because the columns are out of the way and not in plain view. The location for the placement of the IEDs was ultimately decided by WRIGHT and C.S. to be the rear of a column that was not visible from the walking path.

84. Other logistics were discussed including the range of detonation and how and when to place the explosives. C.S. wanted to know how far the button will reach in order to figure out how far away they could be to detonate the IEDs. The CHS said that they will have to find out what time the park closes; if it closes at 9 pm then they should come at 8:30 which would allow them to place the devices by 8:45 pm. WRIGHT said it would be ideal if they could drive across the bridge, blow it and then keep going. Concerning transportation, the CHS suggested that s/he could bring her/his other car to the parking lot early in the day and

---

[4] The Brecksville-Northfield High Level Bridge is oriented east-west, there is a railroad track used by a scenic railroad running underneath the bridge on a north-south axis parallel to the Cuyahoga River and a paved footpath used by pedestrians and bicyclists.

leave it and they could come back later in her/his other car and park it away from the parking lot. They could then ride bikes down in and use the other car to leave. The CHS also suggested that they could take the train in and out of the area.

85. The CHS later stated that on April 28th they will meet the "dude" [UCE] to pick it up, referring to the explosives, and the CHS would drop it off into storage. They agreed to meet at a motel rather than the location they had used in the past to meet with the UCE in order to control the situation in case the UCE was, in fact, law enforcement. The group agreed that the CHS would locate and rent a motel room in which the meet and deal could occur.

86. Lastly, as the surveillance and site planning ended, conversation turned to events after the bridge bombing. WRIGHT stated that Chicago is the main place they were worried about having the protective gear because there is no telling what they might have to use there. He said it will be crazy in Cleveland, but crazier in Chicago with people coming from everywhere to protest the NATO summit. WRIGHT predicted a "s--t load" of people going to Chicago will be coming to Cleveland first and it will be "off the hook" here for a week, then everyone will leave and downtown Cleveland will "be a pile of rubble and ashes", as anarchists in every major city in the country will ultimately be "rioting and destroying each city".

87. On April 25, 2012, the CHS was provided with a body recorder and consensually recorded a meeting between the CHS, WRIGHT and C.S.

88. In sum and substance the three talked about where the CHS should pick them up on Monday to drive to the bridge. WRIGHT said that BAXTER, C.S. and he would be downtown at the festival and should be seen there to help establish an alibi. C.S. suggested meeting at a parking lot on the east bank of the Flats because they do not have very good surveillance in that area. The CHS suggested that after they blow up the bridge they all should go into a store with video surveillance cameras to help establish an alibi, WRIGHT suggested a hardware store because they all work construction so they would not look out of place.

89. On April 27, 2012, the CHS was provided with a body recorder and consensually recorded a meeting with WRIGHT, BAXTER and an individual later identified as J.S.

90. In sum and substance, the conversation started with only WRIGHT, BAXTER and the CHS present. WRIGHT suggested to the CHS that they bring into the group and individual named "SKULLY" who could provide additional surveillance the night of the bombing. WRIGHT stated that he had told SKULLY about half of the plan. WRIGHT and BAXTER discussed the range of the detonator; WRIGHT wanted to have just finished crossing the bridge when it was blown up so they do not look suspicious, but BAXTER thought if the detonator was a cellular telephone they would have a greater range. The three agreed to wait and see what the IED detonation device looked like before deciding the location they will be to detonate the IEDs. BAXTER then said that he would not be at the Saturday night delivery because he had to attend a protest event; however he would be present Monday night. Before leaving the meeting, BAXTER said that he should be called Monday to coordinate the meeting spot for Monday night.

91. As BAXTER left the meeting and before J.S. joined, WRIGHT suggested again to the CHS that J.S. be allowed to join the group because he wants to do "crazy s—t". When J.S. joined the meeting WRIGHT told him that the plan was to meet with the UCE tomorrow to purchase the vests, gas masks, tear gas and C4 they had previously ordered. WRIGHT then told J.S. that on Monday they plan to "go to the spot they reconned on a bike trail" and blow up a bridge that has a highway on it. J.S. stated that he would go to the delivery with WRIGHT and the CHS.

92. WRIGHT further told the CHS that the time of delivery needed to be changed to either before the start of the festival on Saturday, or sometime on Sunday, April 29, 2012. WRIGHT said that he, BAXTER, and C.S. wanted to attend an event associated with the festival and could not make the meeting previously agreed upon. WRIGHT and the CHS agreed to change the delivery time to 2 pm on Sunday, April 29, 2012 at the same location.

93. On April 28, 2012, WRIGHT called the CHS, but the CHS was not able to record the telephone call. In sum and substance, WRIGHT told the CHS that everyone was still in agreement with the plan to meet on Sunday.

94. On April 28, 2012, BAXTER called the CHS, but the CHS was not able to record the telephone call. In sum and substance, BAXTER told the CHS that he was concerned that there was increased police surveillance because of the ongoing festival, but he wanted the plan to proceed. BAXTER suggested that the group meet later in the evening to finalize the Sunday meeting details.

95. On April 28, 2012, the CHS called BAXTER to arrange for the meeting BAXTER earlier requested, the telephone call was not recorded.

96. In sum and substance, BAXTER said that WRIGHT and C.S. were not available, but the plans for Sunday were still going forward as discussed. BAXTER and the CHS agreed that the CHS would pick up WRIGHT, BAXTER, C.S. and J.S. sometime around 11 am or noon; they would have breakfast, and then proceed to the delivery meeting.

97. On April 29, 2012, the UCE recorded a telephone call with WRIGHT. In sum and substance WRIGHT said that he would call the UCE around 1:30 pm to give the UCE the exact meeting location, however it was in the Warrensville Heights, Ohio area.

98. On April 29, 2012, the CHS was provided with a body recorder and consensually recorded a meeting with the UCE and WRIGHT, BAXTER, and HAYNE.

99. In sum and substance, the CHS picked up WRIGHT, BAXTER, and HAYNE at a location near downtown Cleveland, WRIGHT suggested the CHS should drive around downtown to see if they could locate C.S. and J.S. After several minutes of driving, neither C.S. nor J.S. could be located, so the CHS, WRIGHT, BAXTER and HAYNE left for the delivery location. As they were driving away, the CHS asked HAYNE if he knew the plan, WRIGHT stated that he (HAYNE) "knows what is up." HAYNE said he does not know all the details, but WRIGHT said that he knows the major part of it and BAXTER would fill him in when they pick him up. WRIGHT said that he (HAYNE) does not know the full list of what they are picking up. The CHS told HAYNE that they are getting vests, gas masks and eight

blocks of C4. The CHS told HAYNE that if he did not want to go then he should say so. HAYNE said the he is "cool."

100.     During the drive to the location WRIGHT called the UCE, which was recorded, and gave the UCE the exact location of the meeting.

101.     The CHS, WRIGHT, BAXTER, and HAYNE arrived at the location and put an alarm clock at the location in the trash can in case it was a recording device. They also turned on the television and air conditioning unit in order to baffle any recording devices. The CHS stated that the three subjects all wore latex gloves.

102.     Approximately twenty minutes after WRIGHT called the UCE, the UCE arrived at the location and the meeting was recorded. In sum and substance, the UCE arrived and asked WRIGHT, BAXTER and HAYNE for the money. WRIGHT gave the UCE $450 and counted it quickly in front of him. The UCE gave WRIGHT, BAXTER and HAYNE a duffel bag containing the vests, smoke grenades and gas masks. The UCE then opened two black boxes containing two inert IEDs.

103.     The two inert IEDs were constructed to resemble functioning IEDs, although they contain no actual explosive functionality. The UCE explained to WRIGHT, BAXTER, and HAYNE how to arm the devices by flipping a switch, and then calling into a cellular telephone attached to the C4 by wires. The UCE explained that because the detonator was a cellular telephone they could be anywhere in the world and activate the explosion as long as they had cell service. The UCE started to repeat the steps to use the IED for the second device when HAYNE interrupted him and said "You don't have to explain it again, I have a photographic memory."

104.     The UCE left the location and shortly thereafter the CHS drove WRIGHT, BAXTER and HAYNE back to the pick-up location and kept the items purchased from the UCE as agreed upon.

105.     While they were driving away, WRIGHT explained that he turned the television on to cover their conversation. The CHS asked why he moved the clock. WRIGHT said someone might have found the room and bugged it and he was thinking about taking down the smoke detector for the same reason. WRIGHT said he thought they might have been arrested when the money changed hands, and that is why he threw the money on the bed. The CHS said they would not have been able to drive off with real C4 in the car and WRIGHT agreed.

106.     HAYNE suggested they make a car bomb using the CHS' car and go after the Justice Center, the CHS suggested they should use HAYNE's bike. Then the CHS asked HAYNE if he knew where Route 82 was at, and if he knew where the bridge on it was. HAYNE said he knew where the bridge on Route 82 was and the CHS told HAYNE they were going to take the IEDs and blow the bridge. The CHS asked everyone in the car if the plan was still good, and if they were going to go do it tomorrow night. HAYNE suggested the IEDs be placed in a wooded area perhaps buried in the ground, placed in a duffel or trash bag.

107.     Finally, WRIGHT said he talked to C.S. and C.S. advised he did not want to be part of the project, but still wanted to work on CHS' houses. CHS told WRIGHT to have C.S. call him.

108.     The CHS then met with your Affiant who retrieved the inert IEDs, and other items, from the CHS. The CHS advised your Affiant that WRIGHT said tomorrow WRIGHT, BAXTER, J.S. and HAYNE would carry out the agreed upon plan to detonate the IEDs on the Brecksville-Northfield High Level Bridge.

109.     Based on the above information provided by reporting and recordings made by the CHS, it is your Affiant's belief, based on his training and experience, that the following overt acts, among others, in furtherance of the group's using explosives to damage or destroy the Brecksville-Northfield High Level Bridge have been taken:

110.     WRIGHT recruited BAXTER, C.S. and the CHS to participate in some form of direct action, initially involving smoke grenades and destruction of signage on buildings in downtown Cleveland;

111.     WRIGHT repeatedly asserted he downloaded the Anarchist Cookbook in an attempt to learn how to make explosives including constructing plastic explosives from bleach and other household items;

112.     When presented with the opportunity to purchase C4, WRIGHT and BAXTER met with an individual offering it for sale;

113.     WRIGHT, BAXTER, and C.S. met with the CHS on multiple occasions together and separately and discussed a number of acts of violence;

114.     WRIGHT, BAXTER, and C.S. agreed with the CHS to purchase C4, ultimately agreeing to pay $900 to the UCE to purchase the C4 in pre-made IEDs;

115.     WRIGHT, BAXTER, and C.S. agreed with the CHS to use the IEDs on the Brecksville-Northfield High Level Bridge and further agreed that WRIGHT, BAXTER, C.S., and the CHS would place the IEDs on the bridge, then the CHS would drive the group to a location where WRIGHT, BAXTER, and C.S. would detonate the IED;

116.     WRIGHT and C.S. visited the National Park underneath the Brecksville-Northfield High Level Bridge and identified locations for the IEDs and discussed logistical plans material to the execution of the plan;

117.     Two days before the delivery of the IEDs, WRIGHT recruited J.S. into the group in order to assist in the execution of the plan;

118.     On the day of delivery of the IEDs, WRIGHT reintroduced HAYNE into the group by disclosing details of the plan to him and bringing him to the delivery;

119.     WRIGHT, BAXTER, and HAYNE met with the UCE on Sunday, April 29, 2012 and purchased the inert IEDs and other, agreed-upon riot gear and smoke grenades.

## **CONCLUSION**

120.　　Based upon the above information, there is probable cause pursuant to Federal Criminal Rule 4 to believe that WRIGHT, BAXTER, and HAYNE conspired together to acquire C4 explosives with the intent to use the explosives to damage or destroy the Brecksville-Northfield High Level Bridge in Sagamore Hills, Ohio. As a result of this conclusion, your Affiant requests authority to arrest WRIGHT, BAXTER, and HAYNE for Conspiracy and Use of an Explosive or Attempted Use of Explosive Materials pursuant to Titles 18 U.S.C. §§ 371 and 844(i).

Respectfully submitted,

Ryan M. Taylor
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on April 30, 2012:

GREGORY A. WHITE
UNITED STATES MAGISTRATE JUDGE

21